# Richmond.

## PANNILL'S ADM'R v. CALLOWAY'S COMMITTEE AND ALS.

### January 31st, 1884.

1. JURISDICTION—*Voidable orders—Lunatics—Committees—Case at bar.*—In 1847 J was appointed committee for G, a lunatic, by an order of the circuit court of H county. In 1853 P was, by an order of the county court of said county, appointed committee of said lunatic, *so far only as his interest in a certain estate was concerned,* and with two sureties executed bond ; and this order was never reversed, and under it P, as such committee, possessed himself of the lunatic's estate.

HELD:

    1. In 1853 the county court was a court of general jurisdiction, and invested by law with special jurisdiction over the persons and estates of lunatics. Neither the committee nor his sureties can, in another proceeding, object that the order was void. *Monteith* v. *Commonwealth,* 15 Gratt. 185.

    2. It might be different if the lunatic objected to the legality of the appointment of the committee.

2. LUNATICS—*Committees—Liability.*—Whatever estate of the lunatic the committee received by virtue and under color of his appointment, he is liable for. If one assume to act as a trustee in relation to trust property, without just authority, he shall be held liable equally as if he had been lawfully appointed.

3. IDEM—*Idem—Idem—Case at bar.*—J, the committee of G, who had been appointed by the circuit court, was largely indebted, and procured judgment and execution to be obtained against him by J, through H, his next friend, and on the execution slaves and other personal property were received with the approval of H, by P, who had been appointed committee of J, as to a certain estate only, by the county court, which slaves, &c., were *not converted to P's own use,* but were lost by the results of the late war.

HELD:

    1. Under the circumstances of this case P and his sureties cannot be held liable for said slaves, &c.

2. *Brown* v. *Lambert's Adm'r and als.*, 33 Gratt. 256, reviewed and distinguished from this case.

3. So far as any of the property received by P on the execution was converted to his own use, he and his sureties are liable.

4. COMMITTEE—*Sureties.*—The estate of the committee should be first exhausted before that of his sureties is touched for money for which he is officially liable.

Appeal of Peter W. Watkins, administrator of George Pannill, deceased, and others, from decrees of chancery court of Richmond city, rendered 14th June, 1879, and 23d October, 1879, and on 3d February, 1881, respectively, in suit of George Calloway's committee against Peter W. Watkins, as administrator of George Pannill, deceased (who had in his lifetime been committee of said George Calloway), and his sureties. The decrees held the estate of said George Pannill, and his sureties, as such committee, liable for large sums received by him as such committee, and from these decrees the appeal was obtained.

Opinion states the facts of the case.

*J. A. Jones, J. E. Penn, S. W. Williams,* for the appellants.

*L. R. Page, O. G. Kean, J. M. M. Davis,* for the appellees.

LACY, J, delivered the opinion of the court.

In 1847, upon an inquisition of lunacy, the circuit court of Henry appointed John Calloway a committee for his son, George H. Calloway. Subsequently, in the year 1853, George Pannill, by order of the county court of Henry, was appointed committee for the same lunatic, so far as his interest in the estate of Robert Hairston was concerned, who, together with George Hairston and Peter W. Watkins, as his sureties, entered into and acknowledged a bond in the penalty of $50,000 as such committee.

In 1867, suit was instituted in the circuit court of Henry county by David H. Spencer and Evans A. Davis, styling themselves committee of George H. Calloway, the lunatic, alleging the death of George Pannill in 1865; that his estate was insolvent; that they had received nothing from that source; that the estate of George Pannill was largely indebted to the lunatic; that Peter W. Watkins had qualified as administrator of George Pannill's estate; that George Hairston had died in 1863, and his estate had been committed to Jesse Wootton, sheriff, who having died, it was committed to the hands of Jeremiah Griggs; that Pannill's estate being insolvent, his security, Peter W. Watkins, was able to pay but little; and that the personal estate of the other security was lost and destroyed by the war; but that said Hairston left a large landed estate, which had been devised and passed to his children under his will, who, together with his grandchildren, are set forth in the bill; and praying an account of the transactions of George Pannill, as committee, and asking to charge the estate of said Pannill, Watkins and Hairston to the payment of the alleged indebtedness of said Pannill.

In January, 1868, in the said circuit court of Henry, a decree was entered in the cause, whereby it appears that the two causes of *Spencer & Davis* v. *Griggs, adm'r of George Hairston,* and *the same* v. *Peter W. Watkins, in his own right, and as adm'r of Pannill, dec'd,* were heard together and consolidated by consent of parties. The court decreed an account of John Calloway, committee of George H. Calloway; an account of George Pannill, dec'd, as committee of said lunatic, so far as the interest in the estate of Robert Hairston was concerned; an account of C. Y. Thomas, executor of John Calloway, dec'd; an account of Watkins, as adm'r of George Pannill, dec'd; an account of Griggs, as adm'r of George Hairston, dec'd; an account of the executrix of Dr. George S. Hairston, dec'd; an ac-

count of the real estate devised by or descended from George Hairston, dec'd, and Dr. George S. Hairston, dec'd, in the hands of the devisees, or aliened by them when and to whom; overruling the demurrer of the defendants, Griggs and Watkins, to the bill in the second named cause.

The demurrer set forth that there was no legal evidence of the due execution of the bond, and the minutes of the court showed that the bond was entered into before the qualification and appointment of Pannill, and does not appear to be connected with it; that the circuit court having appointed one committee for this lunatic in 1847, the county court of the same county was without authority to appoint another committee at any time, and certainly not in 1853, when the first committee appointed by the circuit court was still living and acting; and, moreover, that the county court had no lawful authority for appointing a committee for a particular portion of the lunatic's estate.

This demurrer was overruled, and the parties answered, setting up in that form the foregoing defences, and alleging that George Pannill never was and never pretended to be the committee of this lunatic; that the first committee was the father of the lunatic, and acted as such committee, having charge of his person, &c.; that George Pannill was the brother-in-law of the lunatic, had married the lunatic's only sister of the whole blood, and acted, in taking charge of the property of the lunatic, only as heir to the property; that the property of the lunatic consisted chiefly of land and negroes; that he, the said George Pannill, had never converted the slaves nor the land; that the slaves were lost as property by the effects of the late war, and the land was still unconverted in any lawful manner; that such land of the lunatic as had been sold by the said Pannill in Virginia or in Mississippi had been sold without lawful authority, and still belonged to the lunatic's estate, and was no charge against his securities.

The report of the commissioner coming in as to the several matters of account, the estate of Pannill appeared to be indebted to the lunatic in the sum of $23,268.00, as of January 1st, 1860, for sums recovered against the first committee, John Calloway, the father, by the lunatic, George H. Calloway, by his next friend, George Hairston, and which was collected by the said George Pannill, and in the further sum of $16,337.38, as of January 1st, 1865, received by George Pannill of the estate of Robert Hairston, dec'd. When execution issued against John Calloway for the $23,268.61, the said George Pannill receipted the execution for the following property—to-wit: " Amount of crop, stock, and plantation tools, $1,424.00; amount of certain bonds, $5,000.00; amount the valuation of 13 negroes, as of May 8th, 1860, $9,800.00; amount of balance on 2 mules and 1 man, $180 00; board of George H. Calloway, $490; amount paid in slaves in full, $6,374.61; $16,174.61 being paid in slaves in 1860, which were emancipated by the result of the late war." On the 8th day of September, 1868, upon exception, this report was recommitted, with directions by the court to take further account. On the 9th day of May, 1871, by order entered therein, the court, being so situated as to render it improper to try the case in the circuit court of Henry, the cause was ordered to be removed to the chancery court of Richmond for further proceedings to be had therein.

When in the year 1875, the said report of the commissioner having been lost, another decree for account was then entered, directed to James M. Smith, of Henry county. June 28th, 1877, Commissioner Smith reported an account of the estate of the lunatic which came to George Pannill from the estate of Robert Hairston, dec'd, making the amount due from this source $15,480.40, of which $10,767.74 is principal and $4,712.66 is interest, as of January 1st, 1865, making no entry of the real estate, rents or profits; and

from the estate of John Calloway, $30,254.19, of which $23,268.61 is principal and $6,985.58 is interest, and returned the depositions taken in the cause with his report, and a transcript of the record upon which the report was based.

To this report exceptions were filed by the sureties of George Pannill—1st, that the order of the county court was illegal appointing Pannill committee, &c.; 2d, that $3,343.08, decreed lunatic by the probate court of Lowndes county, Mississippi, and received by Pannill, had been twice charged; 3d, that as to the $23,268.01, received from the estate of John Calloway, deceased, there was no evidence of this charge to support it, and that it did not come from the estate of Robert Hairston, deceased, and that George Pannill, as committee of George H. Calloway, had no authority to receive it, and was not responsible for it under his bond.

This report and the exceptions thereto being considered by the court, on the 14th day of June, 1879, the court decided that George Pannill was liable for all the assets which were or which should have been received by him, whether such assets were received from the estate of Robert Hairston, deceased, or from other sources, and whether they were the produce of said lunatic's estate in Virginia, or in Mississippi; overruled the first exception, and sustained the third as to the sureties of George Pannill, deceased, as to their liabilities for the said $23,268.61, received of the estate of John Calloway, and not from Robert Hairston's estate, and sustained the second; and decreed against the obligors in Pannill's bond now alive, and against the personal representatives of such as are dead, for the sum of $16,900 60, with interest on $7,424.66, part thereof, from January 1st, 1879, until paid, and provided that whatever Peter W. Watkins, the living surety, should pay should be first applied to this debt for which the sureties of George Pannill are jointly bound with said Pannill, and decreed

against the estate of George Pannill, in the hands of his administrator, for the said $23,268.61, and liberty was reserved to the plaintiff to apply for further decrees against the heirs and devisees of George Hairston, Sr., deceased.

On the 23d of October, 1879, by another decree, it was referred to a commissioner to take an account of the real estate of George Pannill; an account of the real estate of said Watkins at the date of the former decree of June 14th; an account of the real estate of which George Hairston, deceased, died seized, with an account of its alienation, if any, and an account of such estate passing under the several clauses of his will; the court being satisfied that the complainant's demand could only be satisfied out of the real estate of the defendants.

On the 12th of June, 1880, a decree was entered in the cause, directing that the widow and heirs of George Pannill be made parties.

And on the 3d of February, 1881, another decree was entered in the cause, the report of the commissioner as to the real estate having been filed April, 1880, the said report was received and confirmed.

By this decree, the heirs of George Pannill were required within thirty days to pay the sum of $16,900.60, and the other sum of $23,268.01, with interests and costs, and upon failure to pay, commissioners named were directed to sell the lands of George Pannill, dec'd, upon terms therein named. The value of this real estate was reported at $1,990, which was held liable for the sums of money named above before the property of the sureties was held liable to be subjected to these debts. From this and the foregoing decrees the administrator of George Pannill, the administrator of George Hairston and Peter W. Watkins and others applied for and obtained an appeal, which was allowed June 11th, 1881, by one of the judges of this court.

The appellants insist first that George Pannill was never a committee at all; that the order appointing him was void, because the county court had no power to appoint a committee with limited powers.

The appellees liken this appointment of a committee with limited powers to the apppointment of an administrator with limited powers, citing 1 Lomax on Ex. 169, as to the legality of such appointment of an administrator with limited powers; and claim that the appointment, if not strictly statutory, was the appointment of this committee by a chancery court with general jurisdiction, and that, citing *Bolling* v. *Turner,* 6 Rand. 652, opinion of Judge Brooke: " The error in this case is in not distinguishing it from the action against a lunatic appointed under the statute, where the lunatic is sent to the hospital, and is treated by the statute as *civiliter mortuus,* and the committee as an executor and responsible in like manner. A committee appointed by the chancellor, as in this case, is a mere commissioner of the court," &c. In that case, the committee was appointed by the chancery court, and not by the county court, in the mode prescribed by the statute.

But however this may be, in 1853 the county court was a court of general jurisdiction; it was invested by law with special jurisdiction over the persons and estates of lunatics. The committee having accepted the appointment, and his sureties having voluntarily entered into the bond under such appointment, neither can be now allowed to object that the order was void. It was a matter upon which the county court had full jurisdiction. The error, if an error, was never reversed; it remains unrevoked. By virtue of it the committee has possessed himself of the estate, and it cannot be alleged in favor of the sureties that it was merely void. *Andrews* v. *Avory,* 14 Gratt. 229; *Gibson* v. *Beckham,* 16 Gratt. 321; *Lancaster* v. *Wilson,* 27 Gratt. 624.

In *Montieth* v. *Commonwealth*, 15 Gratt. 172, the sheriff had failed to give bond within the time prescribed by law, and the sureties sought to be relieved on that ground. This court in that case said: "The principle of these and the like cases, say the court in *Wilcox* v. *Smith*, 5 Wend. 231, is this: that a person coming into office by color of election or appointment is an officer *de facto*, although it be conceded that his appointment or election was invalid "; . . . "nor can I perceive any better ground upon which the sureties can stand. If the bond is valid as to him, it is valid as to them. The fact of election is proved by the recital in the condition and admitted in the agreement of facts. And the recital shows the bond was taken and received by virtue of such title." 15 Gratt. 185.

Can this appointment be questioned by Pannill and his sureties? The one voluntarily accepted the appointment and assumed the responsibilities and executed the bond; the others voluntarily assumed the liabilities of sureties.

It must be remembered that it is not the lunatic who is here objecting to the committee upon the ground of illegality of his appointment, and objecting to his receiving his property, but the committee, after he has gotten the property, objecting that he did not get it legally, and his sureties objecting that, although they voluntarily agreed to be bound as sureties under that appointment, that the court had no jurisdiction to take the bond. We think the chancery court did not err in holding that they were bound.

It is again insisted by the appellants that as Pannill did not actually receive the $23,268.61 from John Calloway, and as he had no authority to act outside of what should come from the estate of George Hairston, deceased, to the lunatic, his receipt operated no release to John Calloway, and the debt is still due from him. It is well settled that if a person assume to act as trustee, he shall be treated in equity as a trustee, whether duly appointed as trustee or not.

One who assumes to act in relation to trust property without just authority, however *bona fide* may be his conduct, shall be held responsible both for the capital and the income, to the same extent as if he had been *de jure* trustee. 2 Story's Eq. 201. There can be no question about the liability of Pannill's estate for what he thus received by virtue and under color of his appointment as committee. But under the circumstances of this case, it is not so clear that he shall be held responsible for the money value of the slaves and other property received by him and not sold or converted to his own use.

In the case of *Brown* v. *Lambert*, 33 Gratt. 256, and relied on by the appellees, the trustee, Upton Edmundson, was held liable for slaves belonging to the trust estate which he, assuming to act as trustee, had sold and converted, and the same was recovered of his estate as a preferred debt by his children, the beneficial owners of the trust estate, he having been subsequently appointed trustee, being thus *de jure* as well as *de facto* trustee.

In this case, John Calloway, the father of the lunatic, his committee, who had charge of the estate and person of the lunatic, finding himself in old age and indebted, wishing to save the debt due his unfortunate son, caused suit to be brought against him by one of his son's kindred as next friend of his lunatic son, and a recovery was had of $23,208.61, as we have seen. George Pannill, as the brother-in-law, having married the only sister of the lunatic of the full blood, who is stated to be his heir, and who had been appointed the committee of the lunatic as to the Hairston property, by the consent of George Hairston, the next friend, under whose supervision the recovery was had, assumed to manage the execution, and thus made himself responsible for what he received; as the estate of John Calloway is insolvent, it is not material whether that estate is thereby released or not.

But, as we have seen, George Pannill did not receive money in whole or in part for the debt, but, assuming to act for the best interest of the lunatic, received for the most part the slaves of the lunatic's father, which went at the death of the lunatic to the family of Pannill; he received once sixteen thousand dollars in value of slaves. If he had insisted on the sale of these family slaves, it does not appear from the record that the money could have been fully realized; and if so, as the lunatic was possessed of large landed estates, it does not appear that money would have been more useful than slaves at that time to the lunatic. That these slaves were received in good faith cannot be doubted in this case. That they were ever sold or converted in any way is not alleged. It appears that they were held by Pannill as committee until shortly thereafter they were freed by the effects of the war through no fault of Pannill.

It seems inequitable to hold this committee responsible for their value, with interest from date, and thus to impoverish his children, who will be entitled to the funds at the death of this lunatic, who is now an old person—past three score and ten years. The said Pannill also paid in the collection $490, for board of the lunatic, accrued since the judgment; for this he is obviously entitled to a credit. And it would be difficult to apply a different principle to the stock on the farm—horses, &c.—unless they were converted by Pannill, which does not appear. The amount of $5,000 was received in bonds. If these were received and converted by Pannill, his estate must be held responsible for them. But an account should be taken and the facts ascertained as to whether they were solvent and good when he received them, and whether he has actually converted the proceeds of the same, before he is charged with them. Upon well-settled principles, a court of equity

should first subject the estate of Pannill, in the hands of his personal representative, before decreeing against his sureties; and whatever amount is in the hands of George Hairston's administrator should be subjected to the payment of the amounts due from him before proceeding to sell his real estate in the hands of his devisees. The court below having held Pannill's estate responsible for the loss of these slaves and other property by its decrees appealed from, the same are erroneous in so far, and must be reversed and annulled, and the cause remanded to the chancery court to be further proceeded in in accordance with these views, in order to a final decree therein.

The decree was as follows:

This day came the parties by their counsel, and the court, having maturely considered the transcript of the record of the decrees aforesaid, is of opinion, for reasons stated in writing and filed with the record, that the said decrees of the chancery court of the city of Richmond appealed from. of June 14, 1879, October 23, 1879, and February 3, 1881, are erroneous in so far as they hold the estate of George Pannill liable for the value of the slaves and other property received by the said Pannill from the estate of John Calloway, the father of the lunatic, George H. Calloway, which were never converted by the said George Pannill, and which were lost by the results of the late war, without default on the part of the said Pannill as committee of the said lunatic, and in so far as the said Pannill was charged with the bonds received from John Calloway, without proof that the same had been collected by him. It is therefore considered that the said decrees, so far as they are in conflict with the foregoing opinion of the court and the views herein, must be reversed and annulled, and the cause re-

Decree.

manded to the said chancery court for further proceedings. to be had therein in accordance with the said opinion of the court and the views herein, and that the appellants recover against the appellees their costs by them expended in the prosecution of their appeal aforesaid here; which is ordered to be certified to the said chancery court of the city of Richmond.

DECREE REVERSED IN PART.